UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

ADE BROWN,

              Plaintiff,                        Case No. 1:17-cv-282

v.                                          Honorable Paul L. Maloney

WILLIE SMITH et al.,

              Defendants.

_____/

## OPINION

      This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Thurlby and Larson. The Court will serve the complaint against Defendants Tumbelson, Larson, Sikkemer, Derochas, Stambaul, Enderlie, Fracker, Thompson, and Carlisle. The Court will dismiss without prejudice for improper joinder the remaining 28 Defendants.

**Discussion**

I.     Factual allegations

Plaintiff Ade Brown presently is incarcerated with the Michigan Department of Corrections (MDOC) and housed at the Ionia Correctional Facility (ICF). In his amended complaint (ECF No. 8), Plaintiff sues MDOC Director Heidi Washington, MDOC Director of Mental Health Services Tony Rome, and the following 36 ICF officials: Warden Willie Smith; Deputy Wardens J. Christiansen and (unknown) Scheibner; Assistant Deputy Warden (unknown) Snyder; Prisoner Counselor Lloyd Thurlby; Resident Unit Manager (RUM (unknown) Larson; Sergeants (unknown) Derochas, (unknown) Davis, (unknown) Shaw, and (unknown) Greenfield; Correctional Officers (COs) (unknown) Stambaul, (unknown) Andrews, (unknown) Conners, (unknown) Enderlie, (unknown) Fracker, (unknown) Carlisle, (unknown) Williams, (unknown) Wells, (unknown) Tumbelson, (unknown) Montgomery, (unknown) Mygrants, (unknown) Schaefer, (unknown) Phelps, and (unknown) Ogburn; Lieutenants (unknown) Rysky, (unknown) Zwisker, and (unknown) Howard; Psychiatric Providers (unknown) Doseman and (unknown) Apaul; Nurses (unknown) Sikkemer, (unknown) Thompson, and (unknown) Lang; Nurse Practitioner (unknown) Schaefer; Grievance Coordinator (unknown) Lewis; and Mailroom Officials (unknown) Karber and D. Christiansen.

Plaintiff's lengthy, tedious amended complaint, like his original complaint, consists of 17 pages of tiny handwriting and chronicles a series of incidents from March 18, 2016, when Plaintiff first arrived at ICF, through February 16, 2017. Plaintiff adds an additional five pages of tiny print requesting preliminary injunctive relief. In his amended complaint, Plaintiff sues 38 Defendants and raises claims of excessive force, unclean living conditions, the unconstitutional use

of loud fans, retaliation, failure to provide mental health treatment, interference with telephonic and written communications, interference with the prison grievance process, and denial of equal protection. He purports to bring the action on behalf of himself and all similarly situated prisoners. For relief, Plaintiff seeks compensatory and punitive damages, together with 19 types of injunctive relief.

In his first set of allegations, Plaintiff complains of an incident that occurred on June 1, 2016, at around 10:15 a.m. On that occasion, Defendant Tumbelson was passing out store purchases to inmates in Level V confinement.[1] Plaintiff, however, did not receive his purchases, as Defendant Thurlby had instructed Defendant Tumbelson not to deliver them, because Plaintiff had ordered an excessive number of items, valued at more than $100.00 and including five of each food item ordered.[2] Defendant Larson allegedly agreed with Thurlby to stop the delivery. Plaintiff complains that Thurlby's order was not a result of policy, or, at least, policy of which Plaintiff was aware.[3] Instead, he contends that Thurlby was retaliating against Plaintiff because he had written grievances on Thurlby in the past. Plaintiff also contends that, by not giving Plaintiff his store purchases, Thurlby was subjecting Plaintiff to cruel and unusual punishment.

Plaintiff then took his food slot hostage and told Defendant Tumbelson that he wanted to speak with Defendant Thurlby. Thurlby refused to come. Sergeant Derochas came to Plaintiff's

---

[1] In the MDOC, security classifications, from least to most secure, are: Levels I, II, IV, V and administrative segregation. MICH. DEP'T OF CORR., Policy Directive 05.01.130, ¶ B (effective Nov. 1, 2010).

[2] Under MICH. DEP'T OF CORR., Policy Directive 04.07.112, Attach. A, #33, prisoners housed at Level V may not possess consumable or expendable items that exceed $100.00 in value. *Id.* (eff. Dec. 12, 2013).

[3] Plaintiff alleges that he participated in an incentive program applicable to all Level V programs, under which prisoners could move from stage 1 to stage 6. At stages 4, 5 and 6, prisoners are allowed to order food items from the store.

cell, which was located in the segregation unit. Derochas demanded that Plaintiff cuff up, so that they could shut his food slot. Plaintiff obeyed. However, instead of returning Plaintiff to his cell, as Plaintiff had anticipated, staff took Plaintiff down to the shower, where he was strip-searched. They put him in ankle, hands, and belly chains. Defendants Thurlby and Larson allegedly watched without intervening, and Defendant Nurse Sikkemer was in attendance. Plaintiff asked why this was happening to him, given that he had already released his food slot. Defendant Sikkemer checked his chains to determine whether they were too tight. Despite Plaintiff's claim that they were extremely tight, Sikkemer found that they were all right.

Plaintiff then was escorted to his cell by Defendants Derochas and Stambaul, who, according to Plaintiff, hit him, shoved him into the wall, "choked [him] up," and tried to slam Plaintiff into the floor, "but [Plaintiff] did not allow them too [sic]." (Compl., ECF No. 8, PageID.56.) When Plaintiff reached his cell, Defendant Stambaul adjusted Plaintiff's chains, placing him in "fetal chains," which apparently tied his hands behind him and pulled his legs into the air, preventing him from standing up or moving.[4] (*Id.*) Defendants Stambaul and Derochas then threw Plaintiff in his cell. Either Defendant Tumbelson or Officer Johnson (not a Defendant) was video-recording the incident. Plaintiff was left in chains and in that position for 14 hours. He was not given water breaks or restroom breaks, and the chains were so tight that he continues to this day to have bruising at his wrist and belly. Defendant Sikkemer did not return to Plaintiff's cell to check on the chains. Plaintiff alleges that Defendants Thurlby, Derochas, Stambaul, Tumbelson, Sikkemer,

---

[4] By his description, placement in "fetal chains" appears to be synonymous with being "hogtied" with chains. "In the hogtie restraint, the person is placed in a prone position and his ankles and wrists are 'tied' together above him." *Johnson v. City of Cincinnati*, 39 F. Supp. 2d 1013, 1017 n.2 (S.D. Ohio Jan. 8, 1999).

and Larson, as well as Officer Johnson, all left work at the end of their shifts without removing the chains.

After the first-shift officers left, second-shift Defendants Enderlie and Fracker continued to keep Petitioner in chains for their entire eight-hour shift. The officers taunted and laughed at Plaintiff the entire time, and they called Plaintiff a variety of names. Plaintiff was denied food, water and the use of a bathroom. He was forced to urinate on himself and sit in his urine for the entire shift. Plaintiff kept begging and crying out about the pain, but he was ignored. At 8:00 p.m., Defendant Nurse Thompson stopped by his cell. After hearing his complaints, she promised to help him. However, she left and never returned. Defendant CO Carlisle also ignored Plaintiff.

Plaintiff was released from his chains at 12:00 a.m., when the third shift came on duty. Plaintiff was dehydrated and in serious pain, had lost circulation, and felt as if his body was broken. His body was swollen and bruised. He suffered severe headaches for a substantial period of time. When he received medical treatment the next day or the day after, he was provided pain pills until his headaches finally went away.

Plaintiff next makes a series of allegations about his inability to have his grievances heard and successfully resolved. He alleges that he wrote grievances the next day, but he never received either a response or a grievance identifier. On June 8 or 9, 2016, he received notice that he had been placed on modified grievance access[5] on May 19, 2016. He complains that he did not

---

[5] Under Michigan Department of Corrections policy, a prisoner is placed on modified access for filing "an excessive number of grievances which are frivolous, vague, duplicative, non-meritorious, raise non-grievable issues, or contain prohibited language. . .or [are] unfounded . . . ." MICH. DEP'T OF CORR., Policy Directive 03.02.130, ¶ HH. (eff. July 9, 2007). The modified access period is ninety days and may be extended an additional thirty days for each time the prisoner continues to file a prohibited type of grievance. *Id.* While on modified access, the prisoner only can obtain grievance forms through the Step I coordinator, who determines whether the issue is grievable and otherwise meets the criteria under the grievance policy. *Id.*, ¶ KK.

receive the appropriate notice and that Defendants Smith and Lewis placed him on modified access in retaliation for his exercise of his First Amendment rights. He also alleges that he filed a grievance about the issue, but his placement on modified access prevented him from exhausting his remedies, in violation of his right to due process and as further retaliation. In addition, he alleges that Defendants Christiansen and Schreibner retaliated against him, violated his right to due process when they denied his grievance, falsified evidence and violated policy. Plaintiff sent additional grievances, and he alleges that Defendants Lewis and Smith retaliated against him and violated his right to due process by denying his grievances. He contends that Defendants Christiansen, Scheibner, Lewis and Smith also violated his right to petition government and his right to access the courts.

Plaintiff next contends that Defendants Smith, J. Christiansen, Scheibner, Thurlby and Larson suspended his telephone calls, in violation of his right to free speech and association, as well as in retaliation for his grievances. Plaintiff indicates that his telephone problems dated back to his arrival at ICF in March 2016, when calls he made did not connect. He acknowledges that he does not know why they did not work, but he concludes that it must be retaliation. And, although Defendant Thurlby gave him a new pin number, the phone continued not to work.

During this period, Plaintiff continued to submit multiple grievances, to which he never received responses. He raised his complaints about his telephone at every SCC (Security Classification Committee[6]) meeting, and would not stop raising them, leading Defendant Thurlby

---

[6] *See* MICH. DEP'T OF CORR., Policy Directive 05.01.130, ¶ G (defining Security Classification Committee). Under MICH. DEP'T OF CORR., Policy Directive 04.05.120, ¶ BBB, "housing unit team members and SCC shall regularly review the behavioral adjustment of each prisoner classified to administrative segregation . . . . The reviews shall be conducted at least weekly, at intervals of no more than seven calendar days, during the first two months in segregation and at least every 30 calendar days thereafter until the prisoner is reclassified to general population status. SCC reviews shall include a personal interview with the prisoner; at least one interview each month shall be conducted out-of-cell

to kick him out of the meetings. In addition, on November 18, 2016, Plaintiff again talked to Thurlby about being unable to access the phone, Defendant Thurlby told him that "they won't let me un-suspend it." (*Id.*, PageID.59.) When Plaintiff continued to complain, Thurlby told Defendant that, if he did not stop complaining to him, Thurlby would drop his segregation level from stage 6, the best, to stage 2, at which point Plaintiff would not be eligible to make calls. Plaintiff still complained, and Thurlby did what he had threatened to do. The following day, Plaintiff was dropped to stage 2 and transferred from the B-wing of the unit (the better side) to the A-wing of the unit (the worse side). Plaintiff claims that Defendants Smith, Thurlby, Larson, Christiansen and Scheibner "all must [have] conspired to do this violating my 1st amendment right to free speech and association, access to telephone. And did this out of retaliation for me exercising my 1st amend. rights." (*Id.*)

Plaintiff also alleges that his Jpay mail account was working between March and August 2016. After Plaintiff was placed on modified grievance access in June, he began to help other segregation inmates file grievances and participate in litigation. In July, Plaintiff received a letter from his mother, informing him that she had not received some of the letters he sent home. On July 29, 2016, Plaintiff sent a kite to the mailroom inquiring about the problem. He received an unspecified response on August 2, 2016, from Defendant D. Christiansen.[7] Shortly thereafter, his mother advised him that she could no longer use Jpay to communicate with him. Plaintiff sent a kite to Defendant Thurlby, who did not respond. On September 9, 2016, Petitioner was informed that

---

unless the prisoner chooses not to participated in the review."

[7] Plaintiff repeatedly references attachments, none of which were filed with this Court, either with his original or his amended complaint.

his Jpay would be suspended while he was on loss-of-privileges status. Plaintiff complains that interference with his ability to use Jpay, which is the fastest method of communication with his home, denies him his First Amendment right to freedom of speech and association, and constitutes an Eighth Amendment violation. Plaintiff was not given a grievance form by the grievance coordinator, despite his repeated kites submitted between September 2016 and the present.

Plaintiff next complains that ICF has a policy and custom of violating all prisoners' rights. He also asserts that he should be able to bring all of his claims in a single lawsuit, because they are all connected to each other.

In another set of allegations, Plaintiff complains that the prison has a practice of leaving large fans on in the unit (and elsewhere in the prison) for 24 hours a day, seven days a week, between June and November. He alleges that the custom started before he arrived, "but I caught on and start writing grievances on officers every day who would come in and turn and leaves fans on as soon as inmates started talking with 1 another." (*Id.*, PageID.60.) Plaintiff alleges that Defendants Thurlby, Larson, Derochas, and Davis, as first and second-shift supervisors permitted this ill treatment. Plaintiff reiterates that he sent kites to the grievance coordinator about the same issue almost every day. He complains that he never received a response. As a result of his repetitious grievances, he was placed on modified grievance access for a total additional eight months by Defendant Smith.

Plaintiff also alleges that he wrote grievances about not being given cleaning supplies in administrative segregation. He suggests that the use of the fans in segregation and the lack of cleaning supplies were instituted to retaliate against him and to punish him for writing grievances.

In addition to claiming that his transfer from B-wing to A-wing was retaliatory, he sweepingly claims that only white prisoners are sent to B-wing, while black prisoners are sent to A-wing. He therefore contends that his transfer was discriminatory and violated the Equal Protection Clause.

Plaintiff alleges that Defendants Andrews and Conners are the head correctional officers in his unit. Plaintiff contends that these officers were given control over him because of all the grievances he files. Plaintiff asserts that Andrews and Conners have done such things as take his trays, depriving him of showers, and destroying the property in his cell. They also have dropped his stage while he was on the wing. Plaintiff asked Defendant Thurlby why Andrews and Conners have done these things. Thurlby allegedly yelled at Plaintiff and told him he had nothing to do with it. Plaintiff claims that he knew that Thurlby was lying. Thurlby then told Plaintiff to stop talking to him about it or he would drop Plaintiff's stage. Plaintiff told Thurlby that he could not keep retaliating against him like that when he complained. Thurlby responded, "[W]atch me." (*Id.*, PageID.62.) Thurlby then dropped Plaintiff to a stage 1 and started laughing at Plaintiff.

On February 16, 2017, Plaintiff wrote to Defendants J. Christiansen, Scheibner, Lewis, Washington, and Rome, complaining about the discrimination and retaliation he experienced. Plaintiff received no response, and no one stopped the conduct about which he complained.

In yet another set of allegations, Plaintiff contends that Defendants Warden Smith, Deputy Warden J. Christiansen, Chief Psychiatrist Maranka, psychiatric providers Doseman and Apaul, Director of Mental Health Tony Rome, and Nurse Schaefer all were deliberately indifferent to his mental health needs. Plaintiff alleges that when he arrived at ICF on March 18, 2016, he already was being denied necessary mental health services. Plaintiff continued to send kites about

his mental health needs. Plaintiff alleges that he was depressed, but did not see a psychiatric provider until June. About two or three weeks after he was placed in fetal chains, Plaintiff alleges that he became suicidal, and he was placed on suicide watch for about a week and a half. While Plaintiff was on suicide watch, Defendant Doseman came to see him on several occasions, along with other psychiatric providers , including Gruestferia and Kern (not Defendants). Doseman told Plaintiff that, if he came off suicide watch, Doseman would help Plaintiff to get admitted to outpatient mental health treatment. Once Plaintiff came off suicide watch, Doseman allegedly refused to evaluate Plaintiff or follow mental health policies. Plaintiff suggests that other prisoners with mental health needs were similarly ignored. Plaintiff and his mother both sent letters to Defendants MDOC Director Heidi Washington and Director of Mental Health Services Tony Rome. In response, Defendant Rome evaluated Plaintiff and placed him on outpatient mental health services. In August 2016, Defendant Nurse Practitioner Schaefer diagnosed Plaintiff with several axis 1 and 2 diagnoses, but allegedly failed to include old diagnoses, including schizophrenia, bipolar disorder, major depression and ADHD. She monitored Plaintiff's medication once per month. Plaintiff alleges that Schaefer refused to add the diagnoses Plaintiff demanded, ostensibly because such diagnoses in his file would warrant his removal from segregation. He contends that Defendants Maranka and Doseman told her to do what she did. Plaintiff contends that Defendant Deputy Warden J. Christiansen effectively runs the mental health program, and he does not want to let Plaintiff out of the hole.

Between October and December 2016, Defendant Apaul was his psychiatric provider. Plaintiff complained to Apaul about the alleged retaliation and his inability to get grievances heard. Apaul allegedly did not take any action. Plaintiff also complains that Apaul did not document his

symptoms and did not help get him out of segregation. Instead, Apaul told him that it was his own fault that he was in segregation, and he recommended that Plaintiff stop writing up staff. Plaintiff claims that he and Apaul did not like each other and that Apaul quit talking to him. Plaintiff also alleges that he used to be sexually harassed by Doseman, who allegedly made sexual comments. Plaintiff complains that Doseman stopped talking to him after he complained. Plaintiff alleges that he is diagnosed with "mood disorder, emotional misconduct, personality disorder, High depression, and Anxiety, polysubstance dependence, and more, and with-out medication [he] cannot function." (*Id.*, PageID.64.) He claims that Apaul, Maranka and Doseman are deliberately indifferent to his mental health needs, because they will not authorize his placement in inpatient mental health services or the RTP (Residential Treatment Program[8]) at ICF. He also claims that Defendants Rome and Schaefer are deliberately indifferent for not getting him out of segregation and into a mental health program that includes counseling and group therapy. He also alleges that the failure to treat him is due to the retaliation of Defendants Smith, Maranka, Doseman, Apaul, Thurlby, Larson, and J. Christiansen, because of Plaintiff's grievances and litigation.

Plaintiff argues that the entire course of conduct from June 1, 2016, to February 16, 2017, constitutes a campaign of harassment of which Defendant Heidi Washington and all other Defendants were aware.

## II.    Class Action

Plaintiff purports to bring his complaint as a class action. The Court construes the allegation as a request for class certification. For a case to proceed as a class action, the court must

---

[8] *See* Mich. Dep't of Corr. website, http://www.michigan.gov/corrections/0,4551,7-119-68854_68856_9744-23254--,00.html (describing RTP program).

be satisfied on a number of grounds, including the adequacy of class representation. *See* FED. R. CIV. P. 23(a)(4). It is well established that *pro se* litigants are inappropriate representatives of the interests of others. *See Garrison v. Mich. Dep't of Corr.*, 333 F. App'x 914, 919 (6th Cir. 2009) (citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)); *see also Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008); *Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003); *Palasty v. Hawk*, 15 F. App'x 197, 200 (6th Cir. 2001); *Howard v. Dougan*, No. 99-2232, 2000 WL 876770, at *1 (6th Cir. June 23, 2000). Because Plaintiff is an incarcerated *pro se* litigant, the Court finds that he is not an appropriate representative of a class. Therefore, the Court will deny Plaintiffs' request for class certification.

III.     Misjoinder

Federal Rule of Civil Procedure 20(a) limits the joinder of parties in a single lawsuit, whereas Federal Rule of Civil Procedure 18(a) limits the joinder of claims. Rule 20(a)(2) governs when multiple defendants may be joined in one action: "[p]ersons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Rule 18(a) states: "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party."

Courts have recognized that, where multiple parties are named, as in this case, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is
> more than one party on one or both sides of the action. It is not concerned with

joinder of claims, which is governed by Rule 18. Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18. . . .

Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all.

7 CHARLES ALLEN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE CIVIL § 1655 (3d ed. 2001), *quoted in Proctor v. Applegate*, 661 F. Supp. 2d 743, 778 (E.D. Mich. 2009), and *Garcia v. Munoz*, No. 08-1648, 2007 WL 2064476, at *3 (D.N.J. May 14, 2008); *see also Neitzke v. Williams*, 490 U.S. 319, 328 (1989) (joinder of defendants is not permitted by Rule 20 unless both commonality and same transaction requirements are satisfied).

Therefore, "a civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact." *Proctor*, 661 F. Supp. 2d at 778. When determining if civil rights claims arise from the same transaction or occurrence, a court may consider a variety of factors, including, "the time period during which the alleged acts occurred; whether the acts of . . . are related; whether more than one act . . . is alleged; whether the same supervisors were involved, and whether the defendants were at different geographical locations." *Id.* (quoting *Nali v. Michigan Dep't of Corrections*, 2007 WL 4465247, *3 (E.D. Mich. December 18, 2007)).

Permitting the improper joinder in a prisoner civil rights action also undermines the purpose of the PLRA, which was to reduce the large number of frivolous prisoner lawsuits that were being filed in the federal courts. *See Riley v. Kurtz*, 361 F.3d 906, 917 (6th Cir. 2004). Under the PLRA, a prisoner may not commence an action without prepayment of the filing fee in some form.

*See* 28 U.S.C. § 1915(b)(1). These "new fee provisions of the PLRA were designed to deter frivolous prisoner litigation by making all prisoner litigants feel the deterrent effect created by liability for filing fees." *Williams v. Roberts*, 116 F.3d 1126, 1127-28 (5th Cir. 1997). The PLRA also contains a "three-strikes" provision requiring the collection of the entire filing fee after the dismissal for frivolousness, etc., of three actions or appeals brought by a prisoner proceeding in forma pauperis, unless the statutory exception is satisfied. 28 U.S.C. § 1915(g). The "three strikes" provision was also an attempt by Congress to curb frivolous prisoner litigation. *See Wilson v. Yaklich*, 148 F.3d 596, 603 (6th Cir. 1998).

The Seventh Circuit has explained that a prisoner like plaintiff may not join in one complaint all of the defendants against whom he may have a claim, unless the prisoner satisfies the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produced but also to ensure that prisoners pay the required filing fees-for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees. 28 U.S.C. § 1915(g) . . . .
>
> A buckshot complaint that would be rejected if filed by a free person -- say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions -- should be rejected if filed by a prisoner.

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Brown v. Blaine*, 185 F. App'x 166, 168-69 (3rd Cir. 2006) (allowing an inmate to assert unrelated claims against new defendants based on actions taken after the filing of his original complaint would have defeated the purpose of the three strikes provision of PLRA); *Patton v. Jefferson Correctional Center*, 136 F.3d 458, 464 (5th

Cir. 1998); *Shephard v. Edwards*, 2001 WL 1681145, * 1 (S.D. Ohio Aug[.] 30, 2001) (declining to consolidate prisoner's unrelated various actions so as to allow him to pay one filing fee, because it "would improperly circumvent the express language and clear intent of the 'three strikes' provision"); *Scott v. Kelly*, 107 F. Supp. 2d 706, 711 (E.D. Va. 2000) (denying prisoner's request to add new, unrelated claims to an ongoing civil rights action as an improper attempt to circumvent the PLRA's filing fee requirements and an attempt to escape the possibility of obtaining a "strike" under the "three strikes" rule). To allow Plaintiff to proceed with these improperly joined claims and defendants in a single action would permit him to circumvent the PLRA's filing fee provisions and allow him to avoid having to incur a "strike" for purposes of by § 1915(g), should any of his claims turn out to be frivolous.

Plaintiff's first set of allegations concern the incident on June 1, 2016, when Defendant Tumbelson refused to deliver Plaintiff's store purchases, on the order of Defendant Thurlby, because Plaintiff had requested excessive food items. Plaintiff makes a conclusory allegation that Thurlby issued his order because of unspecified grievances that Plaintiff previously had filed. In his next set of allegations, which the Court concludes is part of the same series of transactions or occurrences, Plaintiff apparently took his food slot hostage in response to being denied his store purchases. He complains that Defendant Derochas cuffed Plaintiff, and, together with Defendant Stambaul, escorted Plaintiff to the shower for a strip search and placement in chains before being transported to segregation. Plaintiff alleges that the cuffs were too tight, but Defendant Nurse Sikkemer nevertheless concluded that they were not too tight. Defendants Derochas amd Stambaul then allegedly assaulted Plaintiff, using excessive force, before placing Plaintiff in fetal chains in his cell. He asserts that Defendant Tumbelson was recording the chaining. Finally, he

claims that Defendants Thurlby, Derochas, Stambaul, Tumbelson, Sikkemer, Enderlie and Fracker left Plaintiff in fetal chains for 14 hours.  In addition, Plaintiff alleges that Defendants Thompson and Carlisle came to the cell at 8:00 p.m., were informed that Plaintiff had been in chains all day, but did nothing about it.

Plaintiff's allegations against the remaining 28 Defendants are unrelated to the June 1, 2016 incident, except by Plaintiff's conclusory allegation that all of the other incidents were part of a scheme or conspiracy to deprive him of his rights.  A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action."  *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)).  The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff.  *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).  Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Plaintiff's allegation that all Defendants acted to conspire is wholly conclusory and speculative.  His allegations, even viewed in the light most favorable to Plaintiff, describe a number of discrete incidents that occurred over a period of time involving numerous individual officers.  Plaintiff has provided no allegations establishing a link between all 38 Defendants or any agreement

between them.  He relies entirely on a highly attenuated inference from the mere fact that he has been disciplined by or subjected to objectionable treatment by a variety of prison officials in various circumstances with which he disagreed.  As the Supreme Court has held, such allegations, while hinting at a "possibility" of conspiracy, do not contain "enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.  Instead, the Court has recognized that although parallel conduct may be consistent with an unlawful agreement, it is insufficient to state a claim where that conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior."  *Iqbal*, 556 U.S. at 680.  In light of the far more likely possibility that the various incidents occurring over the long history of Plaintiff's incarceration were unrelated, Plaintiff fails to state a plausible claim of conspiracy.  He therefore fails to demonstrate that his claims against the 28 Defendants who were not involved in the initial set of occurrences related to his denial of his store purchases are properly joined.

Under Rule 21 of the Federal Rules of Civil Procedure, "[m]isjoinder of parties is not a ground for dismissing an action."  Instead, Rule 21 provides two remedial options: (1) misjoined parties may be dropped on such terms as are just; or (2) any claims against misjoined parties may be severed and proceeded with separately.  *See DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006); *Carney v. Treadeau*, No. 07-cv-83, 2008 WL 485204, at *2 (W.D. Mich. Feb. 19, 2008); *Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 940 (E.D. Mich. 2008); *see also Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 682 (6th Cir. 1988) ("Parties may be dropped . . . by order of the court . . . of its own initiative at any stage of the action and on such terms as are just.").  "Because a district court's decision to remedy misjoinder by dropping and dismissing a party, rather than severing the relevant claim, may have important and

potentially adverse statute-of-limitations consequences, the discretion delegated to the trial judge to dismiss under Rule 21 is restricted to what is 'just.'" *DirecTV*, 467 F.3d at 845.

At least three judicial circuits have interpreted "on such terms as are just" to mean without "gratuitous harm to the parties." *Strandlund v. Hawley*, 532 F.3d 741, 745 (8th Cir. 2008) (quoting *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000)); *see also DirecTV, Inc.*, 467 F.3d at 845. Such gratuitous harm exists if the dismissed parties lose the ability to prosecute an otherwise timely claim, such as where the applicable statute of limitations has lapsed, or the dismissal is with prejudice. *Strandlund*, 532 F.3d at 746; *DirecTV*, 467 F.3d at 846-47; *Michaels Building Co.*, 848 F.2d at 682.

In this case, Plaintiff brings causes of action under 42 U.S.C. § 1983. For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See* MICH. COMP. LAWS § 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). Furthermore, "Michigan law provides for tolling of the limitations period while an earlier action was pending which was later dismissed without prejudice." *Kalasho v. City of Eastpointe*, 66 F. App'x 610, 611 (6th Cir. 2003).

All of the actions about which Plaintiff complains occurred in 2016 and 2017, well within the three-year period of limitations. The claims, therefore, are not at risk of being time-barred. Accordingly, the Court will exercise its discretion under Rule 21 and dismiss all Defendants other than Defendants Tumbelson, Thurlby, Larson, Sikkemer, Derochas, Stambaul, Enderlie, Fracker, Thompson, and Carlisle from the action, without prejudice to the institution of new,

separate lawsuits by Plaintiff against those Defendants.[9] *See Coughlin*, 130 F.3d at 1350 ("In such a case, the court can generally dismiss all but the first named plaintiff without prejudice to the institution of new, separate lawsuits by the dropped plaintiffs"); *Carney*, 2008 WL 485204, at *3 (same).

IV.     Remainder of Complaint:  Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill*

---

[9]As fully discussed in this opinion, Plaintiff is cautioned that he must limit all future actions to Defendants who are transactionally related to one another.  Not all of the dismissed claims and Defendants would be properly brought in a single new action.

*v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## A. Denial of Store Purchases

Plaintiff alleges that Defendant Tumbelson violated his Eighth Amendment rights when he refused to deliver Plaintiff's store order of snack foods. He also alleges that Defendant Thurlby ordered that the food items not be delivered, in violation of the Eighth Amendment and in retaliation for past grievances filed by Plaintiff.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential

food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

Plaintiff's first allegation, that Defendant Thurlby directed Defendant Tumbelson to not deliver Plaintiff's purchases of snack food items on June 1, 2016, falls far short of demonstrating an Eighth Amendment violation. Allegations about temporary inconveniences, e.g., being deprived of a lower bunk, subjected to a flooded cell, or deprived of a working toilet, do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *see also J.P. v. Taft*, 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006) ("[M]inor inconveniences resulting from the difficulties in administering a large detention facility do not give rise to a constitutional claim." (internal citation omitted)). *But see Flanory v. Bonn*, 604 F.3d 249, 255-56 (6th Cir. 2010) (holding that allegations that an inmate was deprived of toothpaste for 337 days and experienced dental health problems did not constitute a temporary inconvenience and were sufficient to state an Eighth Amendment claim). Here, Plaintiff is provided three meals per day by the MDOC. The inability to obtain snack food items is a mere temporary inconvenience and falls far short of

demonstrating a deprivation of essential food. Plaintiff therefore fails to state an Eighth Amendment claim against either Tumbelson or Thurlby based on the refusal to deliver his store purchases on June 1, 2016.

Plaintiff also claims that Thurlby directed Tumbelson to withhold delivery of Plaintiff's store purchases in retaliation for an unspecified grievance Plaintiff filed against Thurlby. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."); *Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive).

Plaintiff merely alleges the ultimate fact of retaliation in this action. Plaintiff has not presented any facts to support his conclusion that Defendant Thurlby retaliated against him because Plaintiff filed an unspecified grievance against Thurlby on some prior occasion. Moreover, where, as here, a Plaintiff files nearly continuous grievances,[10] the mere fact that a grievance at some point preceded the complained of conduct does not suggest retaliation. *Coleman v. Bowerman*, 474 F. App'x 435, 437 (6th Cir. 2012) (holding that temporal proximity to the filing of a grievance is insufficient because any adverse action "would likely be in 'close temporal proximity' to one of [the plaintiff's] many grievances or grievance interviews"). Accordingly, Plaintiff's speculative allegation fails to state a claim.

### B.     Decision to Take Plaintiff to Segregation Rather Than Returning Him to His Cell

Plaintiff next alleges that Defendant Derochas violated his rights when he took Plaintiff to segregation for taking his food slot hostage, rather than permitting Plaintiff to return to his cell, which Plaintiff expected. Placement in segregation is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. 337, 347 (1981); *see also Jones v. Waller*, No. 98-5739, 1999 WL 313893, at *2 (6th Cir. May 4, 1999). Although it is clear that Plaintiff was denied certain privileges as a result of his administrative segregation, he does not allege or show that he was

---

[10] Plaintiff's complaint is replete with reference to his nearly constant writing of grievances, including multiple grievances about the same issue.

denied basic human needs and requirements. The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation. *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008).

Plaintiff makes no allegation that segregation at ICF imposed conditions that deprived him of his basic human needs and requirements. As a consequence, regardless of Plaintiff's unhappiness with the consequence of his action, Derochas decision to place Plaintiff in segregation was not in itself an Eighth Amendment violation.

### C.    Transporting Plaintiff to Segregation

Plaintiff next alleges that Defendant Derochas placed him in ankle, hand, and belly chains in order to transport him to segregation. He contends that the chains were too tight, but that Defendant Nurse Sikkimer concluded they were not overly tight and Defendant Derochas refused to loosen them. He complains that Defendants Thurlby and Larson watched his placement in chains, but did not intervene. He asserts that Derochas, Thurlby, Larson, and Sikkemer violated his Eighth Amendment rights by not loosening the chains. Plaintiff also alleges that, while transporting Plaintiff to segregation, Defendants Derochas and Stambaul assaulted and battered him by hitting him, slamming him against the wall, and choking up on the chains. He also alleges that he fought Defendants to prevent them from slamming him to the ground.

The Eighth Amendment prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton infliction of pain are those that are "totally without penological justification." *Id.* Plaintiff's claim involving the use of restraints must be analyzed

-24-

under the Supreme Court authority limiting the use of force against prisoners. This analysis must be made in the context of the constant admonitions by the Supreme Court regarding the deference that courts must accord to prison or jail officials as they attempt to maintain order and discipline within dangerous institutional settings. *See, e.g.*, *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986). Plaintiff is incarcerated at ICF, which is a Level V facility, the highest level in the state.

Generally, restrictions and even harsh conditions of confinement are not necessarily cruel and unusual punishment prohibited by the Eighth Amendment. *Rhodes*, 452 U.S. 347. The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley*, 475 U.S. 312, should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178-79 (2010). Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7; *Wilkins*, 130 S. Ct. at 1178. In determining whether the use of force is wanton and unnecessary, the court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response. *Hudson*, 503 U.S. at 6-7 (citing *Whitley*, 475 U.S. at 321); *accord Griffin v. Hardrick*, 604 F.3d 949, 953-54 (6th Cir. 2010); *McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990). Physical restraints are constitutionally permissible where there is penological justification for their use. *Rhodes*, 452 U.S. at 346; *Jones v. Toombs*, No. 95-1395, 1996 WL 67750, at *1 (6th Cir. Feb. 15, 1996); *Hayes v. Toombs*, No. 91-890, 1994 WL 28606, at * 1 (6th Cir. Feb. 1, 1994); *Rivers v. Pitcher*, No. 95-1167, 1995 WL 603313, at *2 (6th Cir. Oct. 12, 1995).

By his own admission, Plaintiff refused to accept the fact that his store order was not delivered, and he took control of his food slot, preventing it from being closed. Under these circumstances, and in light of the deference owed prison officials, merely placing Plaintiff in chains for transport to segregation does not rise to the level of an Eighth Amendment violation. As a consequence, Derochas did not violate the Eighth Amendment by placing Plaintiff in chains, and Thurlby and Larson did not violate the Eighth Amendment by watching Plaintiff being placed in chains.

However, Plaintiff's allegation that Defendant Derochas employed and Defendant Sikkemer authorized excessively tight handcuffs is sufficient to state a claim. In addition, Plaintiff's assertion that Defendants Derochas and Stambaul hit Plaintiff, jerked on his chains, slammed him against the wall, and attempted to slam him to the ground are sufficient to state a claim.

### D. Placing and Leaving Plaintiff in Fetal Chains

Plaintiff contends that he should not have been placed in fetal chains, or hogtied, and he contends that Defendants unconstitutionally left him in chains for 14 hours. During his period of restraint, Plaintiff was not given breaks to drink or to use the restroom. The lengthy period of chaining left bruises to his wrists and bell that have lingered for the 17 months between the chaining and the filing of the lawsuit. Plaintiff argues that Defendants Derochas and Stambaul placed him in fetal chains and that Defendant Tumbelson videotaped the chaining. He also contends that these Defendants and Defendants Thurlby, Sikkemer, and Larson[11] all failed to ensure that he was released before they left the prison at the end of their shift, 2:00 p.m. Plaintiff further alleges that Defendants

---

[11]Plaintiff also alleges that Correctional Officer Johnson failed to ensure his release. Johnson, however, is not named as a Defendant in the action.

Fracker and Enderlie kept him in chains from the time they arrived at 2:00 p.m. until they finished their shift at midnight. In addition, at about 8:00 p.m., Defendants Nurse Thompson and Officer Carlisle came through and talked to Plaintiff about being chained all day, but they did not act to release him from his chains.

The Court concludes that the allegations against Defendants Derochas, Stambaul, Tumbelson, Sikkemer, Thompson and Carlisle are sufficient to state a claim with respect to the fetal chaining.

Plaintiff's allegations against Defendants Thurlby, Sikkermer, and Larson, however, are insufficient to state a claim respecting the fetal chains. According to the amended complaint, Thurlby, Sikkemer and Larson were present only when Plaintiff was chained for transportation to segregation, not when he was placed in fetal chains. Plaintiff provides no other factual allegation that would suggest that they ignored his chaining or being left in those chains. He therefore fails to demonstrate that Thurlby, Sikkemer, and Larson were deliberately indifferent to his serious condition when they left work without ensuring that he had been released from the fetal chains.

### E.    Additional Claims Against Thurlby & Larson[12]

Plaintiff alleges that Defendant Thurlby engaged in additional actions against him. He asserts that Thurlby, together with Defendants Smith, J. Christiansen, Scheibner, and Larson, violated his First Amendment rights of freedom of speech and freedom of association by suspending his telephone calls. He contends that Thurlby also violated his right to free speech by retaliating against him for continuing to make complaints about his phone. In addition, he complains that

---

[12] Plaintiff makes no further allegations against the other eight Defendants who were properly joined in the action.

Defendant Thurlby as a supervisor did not prevent other Defendants from leaving the fans on 24 hours a day. He also complains that Thurlby did not answer kites Plaintiff sent to him about accessing his Jpay account. Further, Plaintiff contends that Thurlby became angry when Plaintiff asked why other officers had done something and, after Thurlby said he had nothing to do with it, Plaintiff suggested he was lying. Thurlby told Plaintiff to stop talking to him about it or he would reduce his segregation stage. Plaintiff continued, complaining that Thurlby could not reduce his stage for continuing to talk to Thurlby, at which point, Thurlby dropped Plaintiff's stage.

1. preventing telephone calls

Although Plaintiff alleges that Thurlby and Larson, among others, suspended his calls, he also acknowledges that he has had problems with his telephone since he arrived in March 2016 and that he does not know why his phone access does not work. He also admits that Thurlby initially responded to Plaintiff's complaint by providing Plaintiff with a new pin number. When the new pin number did not fix the problem, Plaintiff filed numerous grievances to which he received no responses. He also complained at every SCC meeting and would not stop until Defendant Thurlby made him leave the SCC meeting. On November 19, 2016, Plaintiff again asked Defendant Thurlby about his phone privileges. Thurlby responded that "they won't let me un-suspend it." (Compl., ECF No. 8, PageID.59.) When Plaintiff again complained, Thurlby told him that, if he continued to complain to him, Thurlby would drop his stage. Plaintiff complained again, and Thurlby dropped him to Stage 2 and transferred him to the B-wing of the unit. Plaintiff contends that Defendant Thurlby must have conspired with Defendants Smith, Larson, J. Christiansen and Scheibner to retaliate against him, to violate his rights to free speech and association, and to deprive him of access to the telephone.

Although Plaintiff alleges that Thurlby was responsible for denying him access to the telephone, by Plaintiff's own admission, Thurlby attempted to fix the problem by issuing Plaintiff a new pin number. Plaintiff also admits that Thurlby told Plaintiff that he had no power to fix the problem. A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of others are not enough to confer liability on a Defendant, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Plaintiff's allegation is wholly conclusory and utterly fails to demonstrate that Defendant Thurlby took any personal action to deprive Plaintiff of his ability to use the telephone.

Plaintiff makes no specific claims about direct action by Larson. Instead, he simply makes a conclusory allegation that Larson, among others, blocked his phone privileges. Such allegations are woefully inadequate to state a claim.

2.     retaliating for exercising free-speech rights

Plaintiff next alleges that Thurlby retaliated against him for exercising his right to free speech by making him leave SCC meetings and by reducing his segregation stage for complaining about problems with his telephone access and the actions of other officers. Plaintiff's retaliation claim fails at the first step: he cannot demonstrate that he was engaged in protected conduct. *Thaddeus-X*, 175 F.3d at 394. "While it is true that a prisoner has a First Amendment right to file grievances against prison officials, *see Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir.1996), 'if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one.'" *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (quoting

*Thaddeus–X*, 175 F.3d at 395). In other words, although Plaintiff may have had a right to file grievances against prison officials, he did not have a right to continue to harangue Thurlby, without consequence, when he did not receive the answer he wanted. *See Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir.1995) ( "The ability to transfer a prisoner who is interfering with prison administration and staff morale goes to the essence of prison management."). Indeed, Plaintiff's decision to continue to complain after being ordered to stop constituted both insolence and disobeying a direct order, in violation of prison policy. MICH. DEP'T OF CORR., Policy Directive 03.03.105, Attach. B (listing and defining Class II misconduct charges). *See also Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (prisoner's act of calling the hearing officer a "foul and corrupt bitch" was not protected conduct because such behavior fell within the definition of "insolence" under the MDOC Policy Directive governing prisoner misconduct); *see also Caffey v. Maue*, ___ F. App'x ___, 2017 WL 659349 (7th Cir. Feb. 15, 2017) (holding that an inmate's name-calling of guards (calling them unprofessional) was a challenge to the guards' authority that was not protected by the First Amendment); *Felton v. Huibregtse*, 525 F. App'x 484, 487 (7th Cir. 2013) (holding that the use of disrespectful language was not protected conduct) (citing cases); *Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 858, 864 (5th Cir. 2004) (concluding that an inmate who accused a chaplain of theological errors during a religious service had engaged in an unprotected challenge to institutional authority).

Similarly, Plaintiff had no right to raise his complaints about his access to the phone in a meeting of the SCC, which was convened for the purpose of reviewing his placement in segregation. A prisoner's right to raise a grievance is not a right to make demands in any setting he chooses. Instead, prison policy expressly provides the means of raising complaints about the

conditions of confinement. *See* MICH. DEP'T OF CORR., Policy Directive 03.02.130 (governing prisoner and parolee grievances).

Plaintiff next sweepingly alleges that Thurlby and Larson conspired with Defendants Smith, J. Christiansen, and Scheibner to retaliate against Plaintiff by transferring him to a different wing, suspending his Jpay, suspending his phone privileges, and failing to resolve every other situation with which Plaintiff is unhappy. Plaintiff's allegations about the alleged conspiracy are wholly conclusory. As previously discussed, such conclusory allegations are insufficient to support a claim of conspiracy. *Iqbal*, 556 U.S. at 680.

### 3. failure to answer kites and supervise

Plaintiff's remaining allegations are that Defendant Thurlby failed to answer Plaintiff's kites about his Jpay account. He also alleges that Defendants Thurlby and Larson failed to ensure that their subordinates did not leave fans running 24 hours per day from June through November. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). As earlier discussed, claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter*, 532 F.3d at 575-76 (6th Cir. 2008), and the acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Plaintiff has failed to allege that Defendants Thurlby and Larson engaged in any active unconstitutional behavior with respect to the Jpay account or the fans.

In addition, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or kite or failed to act based upon information contained in the grievance or kite. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Plaintiff must allege that Thurlby, through his "own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Defendant Thurlby's failure to respond to Plaintiff's kite therefore does not state an actionable claim.

4.    refusal to release from segregation

In a sweeping allegation, Plaintiff alleges that Defendants Thurlby and Larson, among others, refuse to release Plaintiff from segregation. As previously discussed, Plaintiff has not alleged that his conditions in segregation violate the Eighth Amendment. *See Hudson*, 503 U.S. at 9. The refusal to release him, therefore, did not violate the Eighth Amendment.

Moreover, Plaintiff fails to allege facts demonstrating that he was deprived of due process by his placement and continuation in segregation. The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano,* 427 U.S. 215, 225 (1976). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a prisoner's loss of liberty implicates a federally cognizable liberty interest protected by the Due Process Clause. According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when a deprivation "will inevitably affect the duration of his sentence" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 486-87; *see also Jones v. Baker,* 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir. 1995).

Confinement in administrative segregation "is the sort of confinement that inmates

should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 467-73 (1983). Thus, it is considered atypical and significant only in "extreme circumstances." *Joseph v. Curtin,* 410 F. App'x 865, 868 (6th Cir. 2010). Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden–Bey v. Rutter*, 524 F.3d 789, 794 (6th. Cir. 2008).

In *Sandin*, the Supreme Court concluded that the segregation at issue in that case (disciplinary segregation for 30 days) did not impose an atypical and significant hardship. *Sandin,* 515 U.S. at 484. Similarly, the Sixth Circuit has held that mere placement in administrative segregation, and placement for a relatively short period of time, do not require the protections of due process. *Rimmer-Bey,* 62 F.3d at 790-91; *see Joseph v. Curtin,* 410 F. App'x 865, 868 (6th Cir. 2010) (61 days in segregation is not atypical and significant). The Sixth Circuit has also held, in specific circumstances, that confinement in segregation for a relatively long period of time does not implicate a liberty interest. *See, e.g.*, *Baker,* 155 F.3d at 812-23 (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke,* 111 F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding). *But cf. Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (13 years of segregation implicates a liberty interest); *Harden-Bey,* 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest); *Harris v. Caruso,* 465 F. App'x 481, 484 (6th Cir. 2012) (eight years of segregation implicates a liberty interest). At the time he filed his complaint, Plaintiff

had been in segregation for less than one year. As discussed, the Sixth Circuit has held that even longer periods of segregation do not implicate due process.

Moreover, even assuming that Plaintiff has a liberty interest in his continued segregation, his due process claim "is not complete unless and until the State fails to provide due process." *Zinermon v. Burch,* 494 U.S. 113, 126 (1990). The Supreme Court has indicated that "[p]rison officials must engage in some sort of periodic review of the confinement of . . . inmates [in segregation]." *Hewitt,* 459 U.S. at 477 n.9. "This review will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* However, the decision to continue confinement must be supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 454 (1985). "This requirement balances the procedural rights of prisoner against the need of prison officials to have freedom to operate their facilities on a day-to-day basis." *Harris,* 465 F. App'x at 484. In short, where an inmate's confinement in segregation implicates a liberty interest, he is entitled to a "periodic review of his confinement, supported by some evidence or indicia of reliability." *Id.* at 485; *see also Selby*, 734 F.3d at 559-60 (holding that the mere formality of holding reviews is not sufficient; whether a given process is meaningful and adequate is a question of fact).

The Due Process Clause does not guarantee that the procedure will produce a correct decision. "It must be remembered that even if a state decision does deprive an individual of life, [liberty], or property, and even if that decision is erroneous, it does not necessarily follow that the decision violated that individual's right to due process." *Martinez v. California*, 444 U.S. 277, 284, n.9 (1980). "[T]he deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon*, 494 U.S. at 125 (emphasis in original).

In the instant case, Plaintiff expressly alleges that his continued segregation has been reviewed in SCC proceedings at least once every month, and he does not allege any defect in the review process. (Am. Compl., ECF No. 8, PageID.59.) As a consequence, he has received all of the process to which he was entitled.

## V.    Preliminary Injunction

Plaintiff seeks a preliminary injunction granting him immediate release from administrative segregation and placement in a mental health program. He also seeks immediate unrestricted access to telephone privileges and Jpay. In addition, Plaintiff asks for a preliminary injunction to stop Thurlby, Andrews, and Conners, or anyone else, from retaliating against him for filing the instant lawsuit. Further, Plaintiff seeks an injunction against Defendants Lewis and Smith, to prevent them from interfering in his lawsuit. Finally, he seeks an injunction to stop the harassment and evil done to him.

The issuance of preliminary injunctive relief is committed to the discretion of the district court. *See Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000). In exercising that discretion, a court must consider whether plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction. *Id.* These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also Ne. Ohio Coal*, 467 F.3d at 1009. Moreover, where a prison inmate seeks an order enjoining state prison

officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432 at 438 n.3, (6th Cir. 1984). The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1986).

Under controlling Sixth Circuit authority, Plaintiff's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his section 1983 action. *NAACP v. Mansfield*, 866 F.2d 162, 167 (6th Cir. 1989). Plaintiff has not made such a showing. The majority of his requested injunctions are related to claims that have been dismissed from the case for improper joinder. Plaintiff therefore cannot demonstrate entitlement to his requested relief in this action. The remaining request for injunctive relief against Defendant Thurlby fails because the Court has dismissed Plaintiff's claims against Defendant Thurlby for failure to state a claim.

Second, the presence of irreparable harm is not evident. A plaintiff's harm from the denial of a preliminary injunction is irreparable only if it is not fully compensable by monetary damages. *See Overstreet*, 305 F.3d at 578. Since filing this motion, the case has proceeded without incident. The remaining claims in this action involve possible Eighth Amendment violations that occurred in June 2016, with no continuing violations by the remaining Defendants.

Finally, the interests of identifiable third parties and the public at large weigh against an injunction. Decisions concerning prison security are vested in prison officials, in the absence of

a constitutional violation. Any interference by the federal courts in the administration of state prisons is necessarily disruptive. The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights. *See Glover*, 855 F.2d at 286-87. That showing has not been made here. Accordingly, Plaintiff's motion for preliminary relief will be denied.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that the claims against Defendants Thurlby and Larson will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will serve the complaint against Defendants Tumbelson, Sikkemer, Derochas, Stambaul, Enderlie, Fracker, Thompson, and Carlisle. The Court will dismiss without prejudice for improper joinder the remaining 28 Defendants.

An Order consistent with this Opinion will be entered.

Dated:  June 7, 2017                     /s/ Paul L. Maloney
                                        Paul L. Maloney
                                        United States District Judge